And we will move on to its twin, Kroner v. Commissioner, which is 20-13902. This time Mr. Christensen is up first, correct? We have Mr. Scherker here for the appellee. Thank you. Thank you. I'll give him a few more seconds. Before you get started, I mean, obviously this is, we're just going to have a continuation of the last argument. And the last thing that your opposing counsel in the last argument said, which has some force to it, is that, look, Congress wanted, even though it may not be in the text, Congress wanted to get supervisors involved in the penalty process early in the penalty process. And we need to try to read this statute in some way to compel supervisors to be involved early in the penalty process. Just what do you say about that? Yeah, thank you. First, I would say the tax court relied heavily on the legislative history. First of all, the statute in the language is not ambiguous with respect to this timing requirement. The Second Circuit did find that there was ambiguity in the statute in the phrase initial determination of such assessment. But that phrase describes what has to be approved, not when. So with respect to the question that is before this court, when must supervisory approval occur? No court has identified any ambiguity in the language of the statute. So first, the language of the statute is the best evidence of congressional intent. Second, even if the court were to look to the legislative history, we think that also supports the commissioner's position. Congress heard testimony that penalties could theoretically be used improperly as a bargaining chip to coerce settlement. And they adopted a solution to that perceived problem. And in the Senate report, under the heading Explanation of Provision, the solution that Congress came up with was that, quote, the provision also requires the specific approval of IRS management to assess all non-computer generated penalties unless accepted. So the solution that Congress came up with to that perceived problem, again, focused on the assessment of the penalty. And that does provide protection to taxpayers that are, you know, under audit. Because the taxpayer knows, you know, that a subordinate IRS official, revenue agent, lacks the authority to actually impose penalties without supervisory approval. So going into any negotiation, the taxpayer and the taxpayer's representatives already know that unless a supervisor approves penalties, you know, they will not be imposed. So they know that going into any settlement discussions. If they were to settle, the Internal Revenue Manual procedures require the supervisor to approve any settlement. So even in that case where a settlement has been reached, the agreed closing procedures require that the supervisor sign off on the settlement. So, again, that provides additional protection to the taxpayer. And no penalty will be assessed without supervisory approval. The assessment cannot occur under the statute unless the supervisor has approved. The last thing I would say is that, you know, the tax court's rule, again, it has no basis in the statutory text, which does not mention communication to the taxpayer. It improperly relied on legislative history to resolve the issue of timing for supervisory approval when the only ambiguity that has been identified in the statute relates to what has to be approved and not when. And because the tax court's rule is so amorphous and difficult to apply, it threatens to undermine the overall penalty scheme. You know, revenue agents communicate all the time with taxpayers, and any premature mention of penalties could forfeit them altogether under the tax court's rule. So for these reasons, unless the court has further questions, I'll reserve the remainder of my time. Very well. Yeah, I see that you've got more than five minutes on the clock, so you'll have some extra time on rebuttal if you need it. Thank you. Thank you very much, Mr. Sherker. May it please the Court, there are two flaws in the IRS's arguments this morning. The first is the failure to acknowledge the importance of the ambiguity in the statute. The ambiguity in the statute is that there is no such thing in the IRS Code as an initial determination of such assessment. As the Court's already observed, an assessment is a technical term under the IRS Code. Now, for a non-tax lawyer, initial determination of an assessment might have some meaning, but within the context of the Code, it's what, and I hope I get this right, Judge Lalber in the tax court called, using ancient Greek, a hapex legomenon, or something like that, which is a word or phrase that occurs only once in a document or corpus, and the phrase has no ordinary meaning in tax law because the words determine and assessment are not normally joined together. So that's where the Chai Court started, that there's no such thing as what Congress put in the statute in the Internal Revenue Code. So can I ask you a question, and I will confess that I'm not a tax lawyer, but I mean, it's clunky, but I mean, couldn't initial determination of such assessment just mean, in essence, determination of what the assessment should be? Yes, initial determination of what the assessment should be. So the question is, when does an initial determination occur? We know under Chai it's no later than a notice of deficiency, although the government seems to want to walk away from that a little bit this morning, so far as I can tell, and that is also not in the statute. It doesn't say prior to notice of deficiency. It says initial determination of the assessment, and using exactly that construction is what the Chai Court did and what the tax court has done in looking to find the point in time at which the IRS says we're done. Here's what we believe the penalties should be. And the tax courts are focused primarily, and there's nothing vague about it, and I'll get to that in a minute. That's the second flaw in the government's argument. The tax court is focused primarily on the use of a revenue agent report or an RIR, which is also known as a Form 4549, which is not ambiguous. That's what's sent to the taxpayer. There's a lot of focus on the letters that go to the taxpayer, and that's important. But Form 4549, as we have in our record here, is not ambiguous. Here's what the penalties are. And the purpose of the statute, as interpreted by the Second Circuit and as interpreted by the tax court, is to prevent that 4549 determination from being accepted by a taxpayer for fear that there's nothing else that they can do except take an appeal. In my case, the letter specifically says this is your time for taking an appeal of this ruling. Now, most people don't think even lawyers know there has to be a final judgment before there's an appeal or some sort of judgment. But most people getting that letter, and again, the cases that this court sees, that the tax court sees, are the cases where it was fought as opposed to the cases that Congress was looking at, which are the cases where a rogue agent is using penalties, threat of penalties, to coerce a settlement, to do exactly that. And that's what Congress wanted to stop. Congress identified a problem and it wanted to stop the problem at the gatehouse and not after you all the way down past the gatehouse to the main house and you're in tax court. And if you wait until then, the cases that the court, the tax court in this court, never sees are the cases where settlements can be coerced. Can I ask you a quick question? This might be part of your second point, and if it is, feel free to put me off. But so you don't dispute, I assume, that the key sort of timing, the focus of the timing inquiry here is on the assessment. Something has to happen before the penalty is assessed, right? You don't dispute that. Correct, and that is the initial determination has to be approved. Yeah, and so your point is we've got to figure out what that initial determination of such assessment is. But you don't dispute that we're only measuring this vis-a-vis the assessment, the actual assessment of the penalty. Right, the statute says you don't get to an assessment. You can never even consider an assessment unless that initial determination has been approved in writing by a supervisor. And so has there been an assessment in this case? No, sir. And so are we technically just sort of like still waiting for whatever this initial determination of such assessment is? We prevailed on the penalty. Well, I guess what I mean to say is like theoretically might a court still be just waiting? I mean, you know, if there's no assessment that's happened, then you're just looking backward in time to see when this thing might have happened. And now we've got to figure out what this thing is? I guess in a sense, of course, where there couldn't be an assessment because the tax court ruled in our favor. This is entirely theoretical. But yes, when an issue like this is presented to the tax court, the question is, was there an approval in writing by a supervisor of that initial determination? Yes. But that's when it's presented to the tax court. And Congress in the legislative history was looking to well before that point in time. And the legislative histories recited at length in the Chai decision. I don't want to spend a lot of the course time. Let me ask you a question, which is a question about how you might be able to win. Okay. So the tax court said the problem here is that a supervisor didn't approve the letter before the letter went out. But as you said, this litigation is about whether there should be an assessment, right? I mean, that's at the end of the litigation. If you were to lose, there would be an assessment. Has a supervisor ever approved the initial determination of such assessment? I mean, did the IRS present any evidence in front of the tax court that a supervisor approved this assessment? Yes, sir. Two months after it went to the taxpayer. Okay. Okay. And the taxpayer had already responded. Mr. Korner had disagreed with the additional tax liability as well as, of course, with the penalties. And that approval happened before the tax court litigation happened? Yes. Okay. Let me ask you a question. So what we've been talking about with the IRS has really been about whether we should kind of adopt the Second Circuit's rule or say something different.  My read of the Second Circuit's rule is that there has to be some approval while the supervisor has discretion to approve or disapprove. If the supervisor approved while the supervisor had some discretion to approve or disapprove here, why wouldn't your arguments be inconsistent with the Second Circuit's rule too? Your Honor, the IRS is over-reading CHI, and we make that point in our brief. Okay. There was never an approval of CHI. It never happened. So the only question was, did there have to be? And the IRS there was arguing we can do it up until the point that the penalty is assessed. And the Second Circuit said no, no later, no later than a notice of deficiency. But as the tax court has ruled, the Second Circuit didn't say an initial determination as a matter of law cannot happen earlier than a notice of deficiency. We don't have anything in the CHI opinion except a notice of deficiency. The IRS in their reply brief says, well, we must assume something else must have happened at some point and some other letters. Well, you don't over-read an appellate decision that way. You don't assume that something underneath the text happened and that the holding means something more than the holding is. So the CHI doesn't prohibit, and no court has held, that CHI prohibits the reading of the tax court that says when the IRS says we are done, here are the proposed penalties. Take them, leave them, or go to an appeal. That's not an initial determination because that's exactly where Congress was looking at the moment of take it, leave it, take an appeal. The other point that I think is important here is this is not a heavy lift for the IRS at all to comply with the tax court. It's in the Internal Revenue Manual now, and there's nothing in the record to show that it's difficult. But this court in the TOT property holdings case, which the government cited in their 20HA letter, and it's now reported at 1 Federal 4th, 1354. This court said, and I quote, Supervisory approval may be documented on a penalty approval form in the form of an email, memo to the file, or electronically. We cited the Oconee Landing tax court decision in our 20HA letter earlier this week. In Oconee Landing, the approval happened in an email. The timing was established by an email. This is not hard. This is not a heavy lift. This requires a revenue agent to send something to a supervisor. And all of this litigation is about whether they should be required to do it. If you start with the proposition that the statute is ambiguous and we have to look at legislative intent, however clunky, and we don't disagree, however clunky the statute may prove to be, Congress had identified a specific problem. If CHI is over read or if the IRS were to succeed in throwing out all of this tax court precedent, that would be completely contrary to the underlying legislative intent because it would allow what the Congress identified as a rogue agent to coerce settlements by threatening a penalty and then pulling it off the table so that they can get a settlement with the taxpayer and no tax court and no judicial court ever looks at it. Let me ask you to address this argument that opposing counsel just made. I want to get your thoughts on this. So opposing counsel says it wouldn't really, you know, it might not do as much for the taxpayer if we read the statute to allow a later approval. But it still does something because when you get that letter that you're talking about from the IRS agent, you know, look, if they're ever going to impose any of these penalties on me, they've got to get a supervisor to approve these. So when we're in negotiations with this IRS agent, you know, we know this guy doesn't have the authority to oppose these penalties himself. He's got to get a supervisor to approve. What do you say about that argument from the other side? I'm saying that a good tax lawyer would know that, but a taxpayer wouldn't know that. And it isn't in the letter. It isn't in the 4549 that says here are what we say the penalties are. It doesn't say subject to written supervisory approval. But that raises a good point, Your Honor, because I also heard from opposing counsel this morning that, well, this doesn't matter because there has to be supervisory approval of the settlement. The whole point, the problem that Congress was trying to fix was a settlement that on its face is just for the tax liability, not the penalties. So the supervisor who sees the settlement obtained by the rogue agent identified by Congress, who threatens penalties to the taxpayer, who then folds and says, I'll pay the tax liability. Just don't assess me the penalties. The supervisor just sees a settlement of a tax liability. That doesn't do anything to protect against what Congress was trying to fix with the statute. That doesn't do anything at all. So the taxpayer doesn't know. The taxpayer who settles doesn't know. And everything that Congress tried to accomplish with the statute, however clunky it is, doesn't get accomplished. Now, the solution for a statute that includes words in it that don't exist in the Code is to look at legislative intent. This isn't just in Justice Scalia's words, looking over the heads of people at a party and trying to find your friends. This is very targeted, express legislative intent for this statute. It's not words on the Senate floor. It's undeniably what the statute was intended to do. I mean, I agree with you that we can consider the purpose of the statute. I guess, to me, the challenging part of interpreting this statute is that there's sort of, if the purpose is to require supervision of the rogue IRS agent who's threatening penalties, then it seems like where does that purpose stop us, right? Like, should we say that the initial determination of an assessment is, you know, a phone? Could it be a phone call that the agent makes to somebody? Could it be, you know, an informal communication that the agent says, you know, you might be liable for some penalties here? If the purpose is that, and we're just looking at the purpose, where is the stopping point on that? This is exactly where, Your Honor, and I choose my words carefully here, that deference under the well-recognized proposition that although this is de novo review, the courts will give deference to the tax court's interpretation of the tax code because this is what the tax court does on an everyday basis. The Supreme Court said so in Dobson. This court has recognized it. The other courts have been able to recognize it. The tax courts have had no difficulty in identifying a bright line. If you get a letter that says, why don't you come on in and we'll discuss tax liability and penalties, that's not a determination. We know here, in my case, that we have a 45-49 that says here's the penalties, and you know what? If you disagree, take an appeal. There's no difficulty in applying a bright line rule to that. The IRS should have no difficulty in applying a bright line rule to that. Thank you very much. Thank you very much, Mr. Sherker. Oh, yeah, Judge Branch. Sorry. Do you have any questions? Thank you, Judge Newsom. I do not. Thank you, Your Honor. Harmless error for not asking. Mr. Christensen. Thank you. My friend has referred to the tax court's decisions on this issue as establishing a bright line, but that is, the rulings are anything but a bright line. If you look at the ruling in Clay, then to Bel Air Woods, in this case, in the Carter case, the tax court is shifting standards. In Clay, it focused on an initial determination of the revenue agent. In Bel Air Woods, the tax court seemed to have backtracked and instead focused on, you know, the initial determination is something that's a formal written communication to the taxpayer that demonstrates that the examination division has made an unequivocal decision to assert penalties and has completed its work. So the inquiry shifted from the subordinate revenue agent to now the examination division. So the tax court's rulings are shifting and still evolving in this area. And we know that the statute doesn't focus on an initial determination of the examination division. It specifically refers to an individual. So, you know, if Congress wanted to create a communication-based rule, Congress could have done that in the statute. But that's not how they addressed this perceived problem. They instead required supervisory approval before any penalty can be assessed. Perhaps Congress could have done a better job. But that's up for Congress to decide and to implement in its statute. The language here is not ambiguous with respect to the timing issue. Again, the only ambiguity that courts have found is within the phrase initial determination of such assessment, which only describes what has to be approved, not when that approval must occur. The Second Circuit in Chai didn't even opine on or ask when did the initial determination occur or what was the initial determination in this case. And we think that the reason is because it's not relevant. The focus of the analysis of the Second Circuit was when does the supervisor lose discretion to approve and determined that that time was when the notice of deficiency is issued. And that formed the basis of the Second Circuit's ruling. So unless there are further questions, I will conclude. Judge Branch? No. Okay. Very well. Thank you both.  That case is submitted.